**UNITED STATES of America, Plaintiff,**

v.

**The CITY AND COUNTY OF SAN FRANCISCO, et al., Defendants.**

**Fontaine DAVIS, et al., Plaintiffs,**

v.

**CITY AND COUNTY OF SAN FRANCISCO, et al., Defendants.**

**Nos. C–84–7089 MHP, C–84–1100 MHP.**

United States District Court, N.D. California.

Feb. 26, 1987.

Shauna Marshall, Donna J. Hitchens, Terisa E. Chaw, Equal Rights Advocates, San Francisco, Cal., William C. McNeill, III, Pearl, McNeill, Gillespie & Standish, Oakland, Cal., Eva Jefferson Paterson, San Francisco Lawyers' Committee for Urban Affairs, San Francisco, Cal., Henri Norris, Oakland, Cal., Mary C. Dunlap, San Francisco, Cal., David L. Rose, Gerald F. George, Joel W. Nomkin, U.S. Dept. of Justice, Civil Rights Div., Washington, D.C., Theresa Fay Bustillos, Los Angeles, Cal., (MALDEF-intervenor), Edwin M. Lee, Asian Law Caucus, Inc., San Francisco, Cal., for plaintiffs.

George Agnost, Philip S. Ward, Michael C. Killelea, Deputy City Attys., San Francisco, Cal., for City & County of San Francisco, Civil Service Com'n, Emmet Condon, John Walsh.

Noel Edlin, Hassard, Bonnington, Rogers & Huber, San Francisco, Cal., for City of Oakland, Henry Gardner, George Hart, Lawrence Eades, defendants.

Michael C. Killelea, Deputy City Atty., San Francisco, Cal., Christopher D. Burdick, David P. Clisham, Carroll, Burdick & McDonough, San Francisco, Cal., for San Francisco Citizens for the Merit System, Robert Farac, Robert Rey, Oscar Bazurto, Tom Rey, et al., intervenor.

Duane W. Reno, Davis & Reno, San Francisco, Cal., for San Francisco Fire Fighters, Local 798, Intern. Ass'n of Fire Fighters, etc., Patrick K. Ebert, Kenneth R. Ross, Brian A. Ballard, Mark A. Ballard, Timothy M. Smith, Michael J. Smith, Russell S. Sherman, Fontaine Davis, Eric H. Washington, Jerilyn North, Robert L. Demmons, Jimmie Braden, Audry Lee, Early Davis, Brandi Swanson, Susan Moorehead, Anne Young, Mary M. Carder, Theresa Rodigou, Kathleen J. Bradshaw, Patricia Murray, Intern. Ass'n of Black Firefighters San Francisco Chapter, intervenors.

## MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

PATEL, District Judge.

This is an employment discrimination action against the San Francisco Fire Department ("SFFD") initially brought by the United States and now joined in intervention by various individual and organizational plaintiffs and defendants. Plaintiffs allege that the City's administration of certain employment examinations for entry-level hiring and promotional decisions unlawfully discriminated against women and minority groups, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* These examinations include the 1982 H2 entry-level firefighter exam, the 1984 H4 fire inspector exam, and the 1984 H20 fire lieutenant exam. During the pendency of this action, defendants have not hired or promoted anyone from any appointment list generated by the challenged examinations. This is partly attributable to a preliminary injunction entered by the court in February 1986, enjoining the SFFD from utilizing the H2 examination for any employment purpose.

On June 23, 1986, the court found that the H2 entry-level examination adversely impacted women and minorities. In its subsequent pretrial statement, the City conceded that the H20 promotional examination additionally resulted in an adverse impact on certain minority groups. After lengthy settlement negotiations and on the eve of trial, scheduled to begin in October 1986, the City announced that it would no longer attempt to defend the validity of these examinations, as required in a Title VII action after a showing of adverse impact. The City Attorney asked the City's Civil Service Commission to cancel the 1982 H2 and 1984 H20 employment procedures, as well as the 1984 H4 fire inspector procedure. The Civil Service Commission cancelled the H2, H4, and H20 procedures in late October and early November 1986.

Plaintiff-intervenors now move for partial summary judgment and declaratory relief on the basis of the City's abandonment of the validity of its H2, H4, and H20 exams. Their motion is "partial" insofar as it does not encompass the entirety of their pattern and practice claim, additional elements of which they contend must be tried at a later date. Plaintiff United States moves separately for summary judgment on essentially the same grounds, but seeks injunctive relief. For the reasons herein set forth, the court grants partial summary judgment and awards injunctive relief pursuant to the terms outlined below. In response to the informal application of defendant City of San Francisco, the court additionally outlines the procedures to be used by the City if it wishes to engage in interim hiring to avert a "firefighting crisis" which Fire Chief Condon now declares "could occur at any time."

## I. FACTUAL BACKGROUND

### A. *Previous Litigation*

Prior to 1955, the San Francisco Fire Department employed no black firefighters. In 1970, the City of San Francisco had

approximately 1800 uniformed fire personnel, of whom four were black. The same year, the N.A.A.C.P. and various other community organizations brought suit against the SFFD for employment discrimination in *Western Addition Community Organization [WACO] v. Alioto,* C–70–1335 WTS. The action proceeded as a class action, although the court never formally certified a class save for purposes of settlement only in its consent decree of May 18, 1977.

In 1971 the court in *WACO v. Alioto* declined to preliminarily enjoin the SFFD from utilizing its 1968 H2 entry-level firefighter examination for further employment purposes, even though the court had found that the examination adversely impacted minority applicants. *WACO v. Alioto,* 330 F.Supp. 536 (N.D.Cal.1971). The court indicated that an injunction was not necessary in light of representations made by the City that it intended to modify the examination "with a view to widening minority group representation in the Fire Department...." 330 F.Supp. at 540. The court noted that discussions between the parties regarding the modification of the exam had been conducted "constructively and in good faith," and that the City was "aware of the disproportionate representation of [minorities and is] desirous of making [the Fire Department] more representative if that can be done without impairing departmental efficiency." *Id.*

As a result of the negotiations among the parties, the City administered a modified examination in 1971. This examination again adversely impacted minority groups, and hiring from the new list was enjoined by the *WACO* court after the City failed to make any persuasive showing of the new exam's job-relatedness. *WACO v. Alioto,* 340 F.Supp. 1351, 1356 (N.D.Cal. 1972). The court stated that "[t]his is doubly regrettable first, because with a little more effort to comply with the fairly well-established requirements of the law in this field, [the defendants] might have been able to do so; secondly, there is no doubt that the Commission, far from entertaining any intent to racially discriminate, means well and has tried in its own way to im-

prove minority representation in the Fire Department without impairing departmental efficiency...." 340 F.Supp. at 1356.

In 1973 the City again approached the court with a reconstructed entry-level examination. Again the court found that the City could not demonstrate the validity of the examination, and expressed its increasing exasperation at the City's repeated failure to establish an acceptable entry-level employment procedure. *WACO v. Alioto,* 360 F.Supp. 733, 739–41 (N.D.Cal.1973). The court wrote that "[t]he time has come—especially after the City has twice failed to satisfactorily demonstrate the validity of its Fireman H–2 written examination tests—for the City to seriously, rather than superficially and speciously, face up to the problem presented to it by [Title VII] by further efforts to rebut or correct the already legally established presumptive discriminatory effect of its selection procedures." 360 F.Supp. at 739. The court enjoined the use of the written portion of the examination, ordered the Civil Service Commission to utilize only the oral and athletic components of the employment procedure to rank applicants, and further ordered the Commission to proceed with diligence to empirically validate its H2 written test. 360 F.Supp. at 740.

Late in 1973, after the City failed to either validate the H2 written exam or hire additional firefighters pursuant to the terms authorized by prior opinions, the court in *WACO* ordered affirmative relief. The court recited a litany of the City's failures to comply with previous orders of the court, and concluded that "[t]he [Civil Service] Commission's dilatoriness in these matters and apparent stubborn insistence upon arguments and alternatives which this court has repeatedly found unacceptable, have created an intolerable situation; the adequacy of Fire Department manpower for the safety of the City is coming into question; all Fireman H–2 applicants, both minority and non-minority, have been kept in a state of uncertainty for several years and the rights of minority applicants to a more prompt correction of the City's still unvalidated selection proce-

dures are involved." *WACO v. Alioto*, 369 F.Supp. 77, 80 (N.D.Cal.1973), *aff'd*, 514 F.2d 542 (9th Cir.1975), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975). The court accordingly ordered the City to hire one minority for each non-minority hired from the H2 appointment list until all minority applicants on the list had been employed. 369 F.Supp. at 81. The list expired in 1978. Over 55% of the minorities who have joined the SFFD were hired pursuant to this court-ordered arrangement.

A consent decree dated May 18, 1977, terminated *WACO v. Alioto*. In the decree, the court stated that "plaintiffs have demonstrated a prima facie case of racial and national origin discrimination in defendants' manner of entry-level firefighter selection. The court has also found that evidence submitted by defendants up to November 1973 was not sufficient to discharge their burden of proof to explain the disproportionate selection ratios of racial and national origin minority individuals." *WACO v. Alioto*, No. C–70–1335–WTS, consent decree at 2 (N.D.Cal. May 18, 1977). The decree approved the use of a written examination for entry-level firefighters similar to that used by the SFFD in 1973, and also allowed for a physical agility test so long as it "fairly simulate[d] those physical skills expected of successful firefighters." *Id.* The decree stated that

[i]n view of the agreement of the parties and the defendants' efforts of improving the selection process for entry-level firefighter, there is no need for nor would it be appropriate to impose a further ratio or quota hiring order upon defendants. Therefore, in the future, defendants may appoint firefighters in the order in which they appear on the relevant eligible list constructed as set forth in this Consent Decree. It is a goal of the parties, one which each side expects can affirmatively be reached, that the eligible list for entry-level firefighter shall reflect thereon an equitable distribution of minority candidates within the class conditionally certified herein on the order of 40% of the total number of eligibles.

*Id.* at 9–10. The decree was to continue in effect for five years, until 1982, and terminate upon the filing by defendants of an order of dismissal with prejudice. The parties to the present action have agreed that the consent decree expired by its own terms in 1982.

While the *WACO* action focused exclusively on the entry-level H2 examination, the SFFD has faced additional challenges to the legality of its promotional examinations. During 1980 the California Department of Fair Employment and Housing (DFEH) received ten complaints from black firefighters alleging that the SFFD's 1978 H20 fire lieutenant promotional examination was discriminatory. The DFEH subsequently determined that the examination adversely impacted minorities, and that the City had failed to demonstrate that the exam was sufficiently job-related under state law to be deemed valid. The City subsequently appealed the administrative decision to the state superior court, which reversed the DFEH ruling with respect to the examination's job-relatedness. This decision in turn was appealed to the state court of appeal, which reaffirmed the administrative ruling that the City had failed to adequately demonstrate the validity of the exam. *City and County of San Francisco v. Fair Employment and Hous. Comm'n*, No. A024145, slip op. (Cal.Ct. App. May 27, 1986). The City then appealed the decision to the California Supreme Court, which ordered the issuance of a final opinion by the court of appeal. The court of appeal subsequently set aside its prior order by opinion dated October 2, 1986, and requested supplemental briefing on the question of appropriate relief. *City and County of San Francisco v. Fair Employment and Hous. Comm'n*, No. A024145, slip op. (Cal.Ct.App. October 2, 1986). Thus while a final decision has not been rendered with respect to the alleged invalidity of the 1978 H20 promotional examination, it nonetheless has been subject to judicial scrutiny in the ongoing state proceeding which essentially mirrors the *WACO* court's critical consideration of the H2 entry-level examination process.

## B. *Current Litigation*

In 1982 and 1984 respectively, the SFFD administered newly developed H2 entry-level and H20 lieutenant promotional examinations. In 1984, the SFFD also administered an H4 fire inspector examination. Subsequent to the posting of the 1982 examination's results, plaintiff-intervenors and the United States brought separate actions against the SFFD under Title VII of the Civil Rights Act of 1964 and the Revenue Sharing Act of 1972 for failure to correct the effects of past discrimination, and for the continued utilization of invalid hiring procedures adversely impacting minorities and women. The action brought by the United States focused on blacks, Asians, and Hispanics, while the plaintiff-intervenors sought relief for blacks and women. The cases were consolidated in 1986. The gravamen of the consolidated complaints regarding current hiring practices centered on the adverse impact of the SFFD's 1982 H2 entry-level firefighter selection procedure, as well as the adverse impact of its 1984 H20 lieutenant promotional procedure and its 1984 H4 selection procedure for fire inspectors.

On April 10, 1985, the court denied the City's motion requesting in the alternative either the dismissal of the complaint or the entry of summary judgment. On February 12, 1986, the court granted plaintiffs' motion to preliminarily enjoin the City from proceeding with plans to immediately hire entry-level firefighters from the appointment list generated by the challenged 1982 H2 examination. On June 23, 1986, the court granted partial summary judgment on plaintiffs' claims that the 1982 entry-level written exam adversely impacted blacks, and that the 1982 physical agility test (PAT) had an adverse impact on women. Since then, the parties have filed a joint pretrial statement which lists these additional issues as undisputed: (1) the adverse impact of the 1982 firefighter H2 selection procedure as a whole on Hispanics and Asians, if the entire appointment list (E–27) is used in rank order; (2) the adverse impact of the 1982 firefighter H2 physical agility test when used as a qualifying examination for blacks, Hispanics, Asians and women; (3) the adverse impact of the 1982 H2 PAT test when used for ranking of women, Hispanics, and Asians; and (4) the adverse impact of the 1984 fire lieutenant H20 selection procedure as a whole, as initially announced, on blacks and Hispanics.

On October 23, 1986, virtually on the eve of trial [1] and after more than two years of tenacious and uncompromising pretrial litigation in defense of the challenged examinations, the City indicated to the court that it no longer intended to defend the validity of the H2, H4, and H20 examinations, and was prepared to request the Civil Service Commission to cancel the use of the exams for any appointments or promotions within the SFFD.[2] On October 27, 1986, the Commission cancelled the H2 and H20 examinations and all resulting eligibility lists. On November 4, 1986, the Commission did the same for the H4 exam.

On the basis of the City's withdrawal of the H2, H4, and H20 examinations and its decision not to defend their validity, the plaintiff-intervenors and United States move for summary judgment.[3]

1. The trial was originally scheduled for October 14, 1986; it was subsequently continued to October 21, 1986.

2. *See, e.g.,* Response of Defendant City to Davis Motion for Partial Summary Judgment, at 3: "the City has already advised the Court that it does not intend to defend the [H2, H4, and H20] examinations in this proceeding or to otherwise attempt to defend their validity under the *Uniform Guidelines.*"

3. Unlike plaintiff-intervenors, the United States does not move for summary judgment with respect to the alleged illegality of the H4 examination. The government states that it excluded the H4 exam because the parties never stipulated to its adverse impact. Plaintiff-intervenors, in asserting that the defendant has conceded the H4 examination's adverse impact, rely on the City Attorney's repeated public pronouncements to that effect. Furthermore, the City's most recent submission to the court states that "[d]efendants ... cancelled the examination process for H20 Lieutenant and H4 Inspector. The examinations had adverse impact upon various minority and women candidates." Defendants' post-hearing statement dated January 22, 1987, at 3. The court cannot ignore repeated and explicit admissions on the part of the defendant. For purposes of these motions, the court concludes that

## II. LIABILITY OF THE CITY UNDER TITLE VII AND REVENUE SHARING ACT

■ In *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and its progeny (*see, e.g., Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982)), the Supreme Court has developed a three-part analysis for disparate impact cases brought under Title VII of the Civil Rights Act.[4] First, a plaintiff bears the initial burden of demonstrating that a facially neutral employment practice has a "significantly discriminatory impact." 457 U.S. at 446, 102 S.Ct. at 2530. Once the plaintiff makes this prima facie showing of adverse impact, the burden then shifts to the employer to establish the validity of the employment practice. This requires a "showing that any given requirement [has] a manifest relationship to the employment in question." 401 U.S. at 432, 91 S.Ct. at 854. Finally, the plaintiff may still prevail if he or she can show that an otherwise valid employment practice is nonetheless simply a "mere pretext for discrimination." 457 U.S. at 447, 102 S.Ct. at 2530. If the employer cannot demonstrate the validity of the employment procedure, Title VII has been violated. *Clady v. County of Los Angeles*, 770 F.2d 1421, 1428 (9th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1986).

Given the City's various admissions, the factual record is clear: the H2, H4, and H20 examinations adversely impacted minorities and women, and the City will make no attempt to carry its subsequent burden of defending the presumptively suspect examinations in terms of their "manifest relationship to the employment in question."[5] Thus the H2, H4, and the H20 selection and promotion procedures fall within the definition of employment practices proscribed by Title VII. These facts clearly establish a prima facie violation of law entitling plaintiffs to judgment but for one complicating consideration: because the unused examinations have now been cancelled by the City, barring the possibility that any firefighter will ever be hired or promoted pur-

---

the adverse impact of the 1984 H4 examination has been admitted, and that the defendant has chosen not to contest its validity. *See* note 2, *supra*.

4. Under *Cohen v. West Haven Bd. of Police Comm'rs*, 638 F.2d 496, 500 (2d Cir.1980), and *United States v. City of Chicago*, 549 F.2d 415, 439–440 (7th Cir.1977), violations for discrimination under the Revenue Sharing Act of 1972 are governed by the standards established in the context of Title VII. A violation of Title VII, therefore, constitutes a separate violation of the Revenue Sharing Act.

5. Defendant-intervenor Local 798 attempts to resurrect the issue of the examinations' validity by submitting the affidavit of Dr. David Friedlund, attesting to the possible job-relatedness of the H20 exam. He expresses no opinion with respect to the H2 and H4 exams. Local 798 asserts that "[t]he issue of the validity of the examinations that have been withdrawn by defendants has ... not been clearly established. While the City Attorney has expressed an opinion that the tests are invalid, this 'admission' must be treated as an opinion, and not as an undisputed fact that is binding upon Local 798 and other defendants in this action." Local 798 Opposition at 12–13. Plaintiff-intervenors observe that Dr. Friedlund was retained on November 17, 1986, approximately one month after the scheduled trial date, and is not listed in any discovery responses or in the pretrial state-

ment as among the union's expert witnesses. Thus defendant-intervenor attempts to raise a genuine dispute of fact on this issue with the testimony of an undisclosed expert witness who could not testify at trial.

Furthermore, Dr. Friedlund's declaration itself does not raise a genuine dispute of fact with respect to the H20 examination's validity: he states only that "there would be a good chance to defend this examination if the job analysis were strengthened through an independent review by additional subject matter experts and a link-up analysis were performed to show that there is a strong correlation between the job analysis and the questions that were asked of the applicants." Friedlund Declaration at 4. Friedlund thus does not declare that the necessary correlation in fact exists; he only speculates that further analysis *may* establish it. Local 798 offers on the eve of trial only speculation about the possibility of validation at some later date, which must be weighed against the City's flat concession of liability.

Most significantly, defendant-intervenor's argument is fundamentally misplaced and wholly without authority. The City is solely responsible for the development, administration, and evaluation of the challenged examinations. Given its exclusive liability for the validity of the exams, the City's admission of invalidity binds all parties. Defendant-intervenor obviously does not have standing to collaterally attack the City's concession of its own liability.

suant to their discriminatory criteria, the court must determine if there remains an adjudicable basis for liability and relief under Title VII. As a question of law resting on facts not genuinely in dispute, the issue is appropriate for summary judgment. *Deukmejian v. United States Postal Service,* 734 F.2d 460, 462 (9th Cir.1984).

A number of arguments have been advanced by the plaintiffs in support of their claim to relief, each of which will be considered in turn. These include (1) that the cancellation of the examinations denies minority and female applicants an employment opportunity, and is thus actionable; (2) that the cancellation of the examinations works to perpetuate past discrimination in a manner violative of Title VII; and (3) that the cancellation of the examinations on the eve of trial constitutes cessation of illegal activity in a manner that does not assure the impossibility of its repetition, and thus need not moot the action nor bar the entry of prospective injunctive relief assuring future compliance with the requirements of the law.

### A. *Cancellation of Exams and the Discriminatory Denial of Employment Opportunities*

█ Plaintiff-intervenors first argue that the City's administration and subsequent cancellation of the H2, H4, and H20 examinations has denied minorities and women an "employment opportunity" in a manner violative of Title VII. Each of the cases relied upon by plaintiffs for this proposition, though, is distinguishable in a critical respect: all involve some type of differential racial treatment in the actual allocation of employment opportunities. Here, plaintiffs' differential racial and sexual treatment has been suffered solely in the context of the discriminatory rankings generated by the various examinations, which now have been withdrawn prior to the allocation of any employment opportunity.[6]

Plaintiffs cite *Connecticut v. Teal,* 457 U.S. at 440, 102 S.Ct. at 2525, in support of the proposition that minority and female applicants have been denied equal employment opportunities, despite the fact that minority, white, male, and female applicants have all equally born the brunt of the City's decision to withdraw the challenged appointment lists. While the holding in *Connecticut v. Teal* does indeed stand for the proposition that more than simply the "bottom line" hiring ratio bears on the legality of an employer's behavior, 457 U.S. at 451, 102 S.Ct. at 2532, it nonetheless requires a plaintiff to show that he or she actually suffered some type of discriminatory treatment in the actual allocation of jobs or promotions. Accordingly, the *Teal* Court held that blacks who had been initially excluded from a promotional process due to the results of a discriminatory examination could maintain a Title VII action, even though the ultimate result of the process showed no "bottom line" disparity between the number of blacks and whites promoted. As the Court stated, "petitioners seek simply to justify discrimination against respondents on the basis of their favorable treatment of other members of respondents' racial group. Under Title VII, '[a] racially balanced work force cannot immunize an employer from liability for specific acts of discrimination.'" (citation omitted) 457 U.S. at 454, 102 S.Ct. at 2534.

Plaintiffs fix upon the language in *Teal* that a Title VII violation is shown where a member of a protected class has been deprived of an opportunity. *Id.* at 448, 450, 102 S.Ct. at 2531, 2532, quoting *New York Transit Authority v. Beazer,* 440 U.S. 568, 584, 99 S.Ct. 1355, 1365, 59 L.Ed.2d 587 (1979). Plaintiffs emphasize the term "opportunity," which is used repeatedly in *Teal.* This language, however, cannot be read in isolation. In *Teal* the employer actually made appointments from the challenged examination and plaintiffs were not among them. Here, where the City ulti-

---

**6.** *See County of Los Angeles v. Davis,* 440 U.S. 625, 633, 99 S.Ct. 1379, 1384, 59 L.Ed.2d 642 (1979) ("Indeed, it is extremely doubtful, from this record, that the ... proposal had any discriminatory effects to redress. The plan, it must be remembered, was never carried out. As a consequence, there has been no finding that any minority job applicant was excluded from employment as a result of the proposal.")

mately hired and promoted no one, it treated no minority or woman in a manner distinct from white or male applicants for employment purposes, either individually or collectively. *Connecticut v. Teal* does not reach as far as plaintiffs argue.

Plaintiffs rely heavily on *Hall v. City of Auburn,* 567 F.Supp. 1222 (D.Me.1983), for the proposition that the right to equal employment opportunities is violated by the utilization of discriminatory job criteria, irrespective of any ultimate hiring decision. The case involved a woman who was wrongfully excluded from employment on the basis of a written examination. After prevailing in state court on her claims regarding the examination, she won the right to proceed in the hiring process, but ultimately was not hired due to her performance on a physical agility test. The court rejected arguments that the ultimately legitimate decision not to hire her precluded her from being considered a "prevailing party" for purposes of an award of attorneys' fees; the court observed that "[d]efendant's argument ignores the fact that Bernard sought and won the right to be judged on nondiscriminatory job criteria. This achievement alone establishes her as a prevailing party." 567 F.Supp. at 1225.

While the parties argue at length over whether the holding applies only to the definition of a "prevailing party" for purposes of attorneys' fees or rather to grounds for judgment under Title VII, the dispute is irrelevant. The opinion holds that the plaintiff prevailed, either for Title VII purposes or for attorneys' fees, because she established "the right to be *judged* on nondiscriminatory job criteria." (emphasis added) In the instant case, no applicant was ever judged as the plaintiff in *Hall* had been. Discriminatory devices were utilized to evaluate applicants for the SFFD, but no decisions regarding the allocation of employment opportunities were subsequently made pursuant to the discriminatory evaluations—unlike the *Hall* plaintiff, who was judged, rejected, and excluded from the hiring process on the basis of invalid selection criteria.

Plaintiff-intervenors alternatively cite the holding of *Giles v. Ireland,* 742 F.2d 1366 (11th Cir.1984), in support of their argument. *Giles* involved a "no promotion" policy at a state institution divided into three tiers of employment. Blacks constituted 66% of the lowest tier, 18% of the second tier, and 14% of the third tier. 742 F.2d at 1379. The policy prohibited promotions between the first and second tiers, but allowed promotions between the second and third tiers. *Id.* The court held that this policy, although neutral on its face, appeared to discriminatorily exclude blacks from promotion to the third tier by maintaining their underrepresentation in the pool of applicants in the second tier. The court further held that under *Connecticut v. Teal,* even "an equal impact on blacks and whites did not preclude the district court from finding a violation of title VII. The Supreme Court has held barriers to advancement violative of title VII, even where the result of such barriers is an appropriate racial balance." 742 F.2d at 1379. The court then held that the record before it was inadequate to determine the effect of the no-promotion policy on the advancement of blacks, and remanded the issue to the district court. 742 F.2d at 1380.

The *Giles* holding is simply not analogous to this action. By allowing promotional mobility among the tiers heavily populated by whites, but not including the one tier populated predominantly by blacks, the institution in *Giles* awarded promotional benefits disproportionately to white employees. The hiring and promotional freeze attending the cancellation of the SFFD's employment examinations, given the low representation of blacks at all levels, has not had a similarly asymmetrical adverse impact—particularly when one considers that the hiring and promotional freeze itself was imposed to avert an exacerbation of the racial disparity already existent in the SFFD. It is impossible on this record to isolate specific minority individuals who have been discriminatorily burdened by the exam cancellations, as required under *Connecticut v. Teal* to estab-

lish a denial of employment opportunities violative of Title VII.[7]

## B. *Perpetuation of Past Discrimination*

Plaintiff-intervenors argue alternatively that the City's cancellation of its hiring and promotional examinations has violated Title VII by perpetuating past discrimination. Plaintiffs suggest that the cancellation of the exams demonstrates the continuing failure of the SFFD to correct its past abuses, and represents the freeze of an unacceptable status quo. Plaintiffs again cite the holding of the court in *Giles v. Ireland*, 742 F.2d at 1366, in support of this proposition. The *Giles* court stated that "the district court failed to consider whether the failure to promote, although it may not itself have had an overt adverse impact, perpetuated the effects of past discrimination." 742 F.2d at 1378. The court observed how prior discrimination had concentrated blacks at the bottom of the employment hierarchy, and how the no-promotion policy possibly operated to "freeze the effects of past discrimination" in a manner potentially violative of Title VII. 742 F.2d at 1380–81. As the court stated in *N.A.A.C.P. v. City of Evergreen*, 693 F.2d 1367, 1370 (11th Cir.1982), *reh'g denied*, 698 F.2d 1238 (11th Cir.1983), "even absent the threat of future discriminatory behavior, the courts have a duty to correct and eliminate the present effects of past discrimination."

The undisputed factual record before the court contains a litany of failures on the part of the City to establish valid employment procedures for the nondiscriminatory hiring and promotion of minorities and women, attributed by the *WACO* court to the SFFD's "stubborn insistence" on alternatives which the court had previously and unequivocally declared unacceptable.[8] 369 F.Supp. at 80. The court's 1973 order of affirmative relief, following the City's fourth failure to establish the validity of its H2 firefighter exam, dispositively established an historical record of prior discrimination on the part of the SFFD.[9] While not finally resolved, the state court challenge to the 1978 H20 promotional procedure quite possibly will result in a similar finding of discrimination, given the tenor of recent opinions issued in that matter.

■ Prior to determining whether the City's administration and subsequent cancellation of the H2, H4, and H20 examinations unlawfully froze the effects of the SFFD's past record of discrimination, the court must establish what those effects were and whether they remained uncorrected after the termination of the *WACO* consent decree. *Cf. Guardians Ass'n of New York City v. Civil Service Comm'n*, 630 F.2d 79, 109 (2d Cir.1980), *cert. denied*, 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981). While the *WACO* court ordered affirmative relief to correct the effects of past discrimination, and while a number of minorities were hired pursuant to the court's supervision, this court cannot presume as a matter of law that no effects of the earlier discrimination remain. As this

---

7. This conclusion does not bar a subsequent finding at trial that the City discriminatorily denied employment opportunities to identifiable minorities and women. Such a finding, though, would require the court to consider the examinations' administration and cancellation in the context of plaintiff-intervenors' much broader pattern and practice allegations. On a record limited only to the bare fact that the City administered and then cancelled, prior to hiring, certain invalid examinations, the court as a matter of law cannot find a discriminatory denial of individual employment opportunities violative of Title VII.

8. Significantly, the *WACO* court directed its comments in part to employment procedures developed by the City after the extension of Title VII to municipalities in 1972.

9. While the City in the *WACO* consent decree refused to admit to any prior discriminatory behavior nor concede "the legal and constitutional validity of the court's findings of discrimination," *WACO v. Alioto*, No. C–70–1335–WTS, consent decree at 3 (N.D.Cal. May 18, 1977), its boilerplate disclaimer obviously does not restrain this court from considering the record of discrimination established in that action. *See EEOC v. American Tel. & Tel. Co.*, 419 F.Supp. 1022, 1038–1040 (E.D.Pa.1976), *aff'd*, 556 F.2d 167 (3d Cir.1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978); *Vulcan Pioneers, Inc. v. New Jersey Dept. of Civil Service*, 588 F.Supp. 727, 731 n. 5 (D.N.J.1984).

court stated in its order granting preliminary injunctive relief, "[t]he court is certainly free to determine whether the stated purpose [of the consent decree] 'to foster equal employment and promotional opportunity within the San Francisco Fire Department to which defendants are expressly committed, [and] to correct imbalance between the racial and ethnic composition of said department and the work force of the City and County of San Francisco ...' has been fulfilled...." February 12, 1986 Order at 8–9. The necessity of this inquiry is made more compelling by the fact that minorities remain significantly underrepresented in the SFFD, which has yet to hire a woman firefighter.[10] Nonetheless, the court is hesitant on the rather barren record of undisputed facts to attempt to identify the effects of past discrimination which possibly have lingered within the SFFD beyond the expiration of the *WACO* consent decree. This determination must be left to trial, when the court will have before it the full range of relevant evidence regarding the SFFD's satisfaction of the *WACO* consent decree's objectives.[11] In light of this resolution, the court need not reach the subsequent question of whether the administration and cancellation of the examinations impermissibly perpetuated the effects of prior discrimination in a manner violative of Title VII. The court observes, though, that this determination is also more appropriately left to trial, when the court can consider the H2, H4, and H20 examination procedures in the broader context of plaintiff-intervenors' pattern and practice allegations.[12]

## C. *Cessation of Illegal Activity and Mootness*

■ Both plaintiff-intervenors and the United States argue that cancellation of the examinations prior to hiring does not deny the court the authority to enter judgment and grant injunctive relief, given the holding of *United States v. W.T. Grant*, 345 U.S. 629, 632–33, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953) and *County of Los Angeles v. Davis*, 440 U.S. at 631, 99 S.Ct. at 1383. *Grant* and *Davis* stand for the proposition that voluntary cessation of allegedly illegal activity will not moot an action absent a heavily burdensome showing that "'there is no reasonable expectation that the wrong will be repeated,'" 345 U.S. at 633, 73 S.Ct. at 897, quoting *United States v. Aluminum Co. of America*, 148 F.2d 416, 448 (2d Cir.1945), and that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." 440 U.S. at 631, 99 S.Ct. at 1383. Only if both conditions are met will an action be considered moot. *Id.*[13]

Certain of the defendants suggest as a threshold consideration that since the City voluntarily withdrew the examinations prior to any use for hiring purposes, the absence of a discriminatory employment result must preclude any finding of illegal

10. As of June 1, 1985, there were 79 blacks (5.7%), 35 Asians (2.5%), and 88 Hispanics (6.4%) in a force of 1380 uniformed individuals. Department of Labor census data indicates that black, Asian, and Hispanic men respectively comprise 9.6%, 19.3%, and 11.2% of the male civilian labor force in San Francisco. Thus minority men account for approximately 40% of the male labor force in San Francisco, but comprise only 14.6% of the City's firefighting force. Women account for 45% of the total labor force in the City.

11. For example, no evidence regarding the SFFD's minority recruitment program, bearing directly on the question of past discrimination and its rectification, is to be found in the current record of undisputed facts.

12. *See* note 7, *supra*.

13. The City has conceded its liability under this theory. In its response to plaintiffs' motions for summary judgment, the City states that it "recognizes the Court's inherent power to grant the specific type of injunctive relief requested by the Justice Department under the authority cited in *County of Los Angeles v. Davis* (1979) 440 US 625 [99 S.Ct. 1379, 59 L.Ed.2d 642]." Response of Defendant City to Davis Motion for Partial Summary Judgment at 4–5. Nonetheless, because the City apparently has retracted this admission of liability in its last submission, the court will look beyond the City's waivering concession and independently determine its exposure to the entry of judgment under *Davis*. (The City states in its submission to the court dated January 22, 1987, that "the Court should deny the pending motions for summary judgment and grant interim relief [by modifying the existing preliminary injunction]....")

activity and thus bar the award of relief. *See, e.g.,* Response of Defendant-Intervenors Local 798 to Proposed Interim Relief at 12, 15 ("Compliance relief is out of the question because ... the examination has not ... been used to make any appointments....") This analysis completely ignores the fundamental distinction between damage relief and injunctive relief. Unlike an award of damages, ordered to redress some concrete injury,

> [t]he sole function of an action for injunction is to forestall future violations. It is so unrelated to punishment or reparations for those past that its pendency or decision does not prevent concurrent or later remedy for past violations by indictment or action for damages by those injured. All it takes to make the cause of action for relief by injunction is a real threat of future violation or a contemporary violation of a nature likely to continue or recur.

*United States v. Oregon State Medical Society,* 343 U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952). Here the City took every step required to violate the law but the last: it developed and administered unvalidated employment examinations and then tenaciously defended the examinations over the course of two years of pretrial litigation in an attempt to utilize their results for hiring and promotional purposes. In the case of the 1982 H2 appointment list, the City's intent to imminently consummate its concededly discriminatory employment procedure was thwarted only by order of this court preliminarily enjoining the use of the list for any hiring purpose.

Now, on the eve of trial, the City has decided to abandon its long and arduous defense of the H2, H4, and H20 examinations. While this act, by barring the possibility of discriminatory hiring from the examinations, may have averted the infliction of compensable injuries on specific minority and female applicants (a determination that can only be made at trial, in the context of

plaintiff-intervenors' broader allegations), the cancellation of the examinations in no way suggests that the City has now immunized itself from the future use of discriminatory hiring practices. Of course, the opposite is true: the City has only deepened cause for concern by conceding that it has failed once again to develop valid employment procedures for hiring and promotions within the Fire Department, thus adding yet another chapter to an unenviable record of behavior reaching back nearly two decades. For the court to ignore the SFFD's consistent and ongoing inability to utilize nondiscriminatory employment procedures, and to decline to enter judgment and award injunctive relief to assure that this sorry history will finally come to an end, would be inexcusable.[14]

■ The City's behavior is clearly actionable for injunctive relief. The only remaining question, then, is whether its voluntary cessation has mooted the action under the heavily burdensome two-part test in *Davis.* First, in light of this history it cannot "be said with assurance that 'there is no reasonable expectation ...' that the alleged violation will recur....'" (citation omitted) 440 U.S. at 631, 99 S.Ct. at 1383. In *Davis,* the challenged employment procedure—an emergency hiring proposal abandoned prior to both its implementation and the filing of the lawsuit—had been superseded at the time of the Court's review by an acceptable procedure which for five years had drawn over 50% of the fire department's new recruits from minority groups. 440 U.S. at 632–33, 99 S.Ct. at 1383–84. The development and long-term implementation of a new and acceptable hiring procedure, coupled with the defendant's willingness to voluntarily abandon the suspect procedure itself prior to legal challenge, both suggested in *Davis* that there was no possibility that the violation would recur. Here, the City has not developed any alternative hiring procedure, nor has it evinced a willingness to voluntarily relinquish suspect pro-

---

**14.** The appropriateness of injunctive relief at this point is particularly compelling in light of the City's plans to immediately develop a new series of hiring and promotional examinations. Given the City's historical inability to develop valid employment procedures, the possibility of future violations must be precluded by assuring that the City's new examinations finally satisfy the requirements of Title VII.

cedures until long and bitter litigation has all but foretold an ultimate finding of liability. *See, e.g.,* Order Granting Preliminary Injunction dated February 13, 1986 at 11. The recently imposed wisdom of a new City Attorney, who has categorically declared the exams invalid, does not persuade the court that the long-entrenched practices of the City, the Fire Department and the Civil Service Commission will be completely eradicated, never to resurface. Obviously the court cannot conclude on these facts that by cancelling the exams on the eve of trial, the City has carried its heavy burden and demonstrated that there is no possibility that it will once again employ invalid and unacceptable employment procedures.

Nor has the City satisfied the second prong of the *Davis* mootness test, which requires that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." 440 U.S. at 631, 99 S.Ct. at 1383. The City's cancellation of the appointment lists prior to hiring has precluded the most obvious effect of the violation: explicitly discriminatory hiring resulting in the exclusion of specific minority applicants from employment. *See* 440 U.S. at 633, 99 S.Ct. at 1384. However, the City is left with a significantly imbalanced force having few minorities and no women, unlike in *Davis* where the department's new hiring had cured the discriminatory impact of past practices.

The Court in *Davis* identified additional types of discriminatory effects which the court at this point cannot conclude have been eradicated. These include the possibility that minority job applicants were deterred from applying for employment within the SFFD "as a result of the proposed application of the examination," and the possibility that the cancelled exams "reflected a racial animus that might have tainted other employment practices." 440 U.S. at 633, 99 S.Ct. at 1384. Allegations, at this juncture unproven, have been made by plaintiff-intervenors that the examination process had such effects. The burden of proof, while obviously falling with the plaintiffs at trial, falls on the City at this point to show that the injurious effects resulting from the administration and can-

cellation of the exams have been "completely and irrevocably eradicated." *Id.* at 631, 99 S.Ct. at 1383. That burden has not been satisfied.

Accordingly, this dispute is not moot, and plaintiffs are entitled to partial summary judgment and injunctive relief to preclude the possibility that new entry-level and promotional exams will once again fail to satisfy the requirements of the law.

## III. APPROPRIATE RELIEF

Plaintiff-intervenors request only declaratory relief at this juncture, for reasons that are not at all clear. Their stated explanation is not particularly elucidating: "Plaintiff-intervenors' understanding of the law is that in these disparate impact cases, a second hearing is required for remedy purposes (*see, International Brotherhood of Teamsters v. United States of America,* 431 U.S. 324, 361–62, [97 S.Ct. 1843, 1867–68, 52 L.Ed.2d 396] (1978) [sic] ), and therefore, they have not requested any specific relief other than a Declaratory Judgment." Plaintiff-Intervenors' Reply Memorandum at 3. *Int'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), stands only for the proposition that "[w]hen the Government seeks individual relief for the victims of the discriminatory practice, a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief." 431 U.S. at 361, 97 S.Ct. at 1868. Obviously, the question of individual relief is not in issue at this point in the proceedings, given the absence of proven individual injuries.

The court at this juncture considers only the award of injunctive relief, of the nature requested by the United States, so as to assure the expeditious development of valid entry-level and promotional examinations, to preclude the reinstitution of the previous employment practices, and to outline the requirements of any interim hiring that the City may determine is required for the public safety until new, lawful employment procedures are instituted. Given the factual record before the court, the injunction at this stage will not afford affirmative relief.

This does not preclude plaintiff-intervenors from establishing at trial a record of discriminatory practices that is sufficiently egregious and persistent to warrant affirmative race- or sex-conscious relief, thus justifying the modification of the relief herein granted. *Local 28 of the Sheet Metal Workers' Int'l. Ass'n v. E.E.O.C.,* — U.S. —, 106 S.Ct. 3019, 3034, 92 L.Ed.2d 344 (1986). At this point, though, the limited record of undisputed facts before the court does not support such a remedy.

In recognition of the possibility of an imminent "firefighting crisis" if H2 entry-level firefighter employment does not recommence,[15] the court additionally outlines the procedures that the City must follow if it chooses to engage in interim hiring to meet emergency staffing needs. *See Guardians Ass'n of New York City v. Civil Service Comm'n,* 630 F.2d at 113. The court is satisfied that a critical need is shown. Although it appears that at this very moment there is not a pending crisis, it is clear that some immediate preparations may be necessary to select new hirees, adequately train them and arrange their assignment and on-the-job supervision for imminently critical times.

■ The court faces a difficult dilemma insofar as any interim hiring for the H2 position must utilize the appointment lists (E–27 and E–27A) generated by the invalid 1982 H2 examination. As Judge Sarokin observes, "[h]aving concluded that the civil service exam unlawfully denied minorities fair [employment] opportunities, to now permit appointments from lists generated by these invalid exams would totally vitiate the court's ruling and its purpose." *United States v. New Jersey,* 658 F.Supp. 9, 11 (D.N.J.1986). Balanced against the fundamental illogic of allowing interim hiring to proceed on the basis of lists already declared invalid is the pressing need for additional firefighters to preserve the public safety. The court concludes that these competing considerations can be best reconciled by ordering that the City conduct all interim hiring on a provisional basis. Thus, prior to gaining a permanent appointment within the SFFD, all firefighters hired during the interim period will be required to pass all components of the new H2 employment procedure, once developed. The court is acutely cognizant of the burden that this arrangement will place on the men and women hired during the interim period; nonetheless, "[p]ermanent appointments may carry a stigma and pose morale and resentment problems ..." which ultimately may be more burdensome than the provisions here outlined. *United States v. New Jersey, supra* at 7. In any event, the City regrettably has left the court few acceptable alternatives from which to choose.[16]

Finally, while the court does not order or require interim hiring, and outlines its provisions only to allow the City the freedom to conduct such hiring, if it so chooses, to avert a public safety crisis, the hiring must avoid any disparate impact. Therefore, any interim hiring conducted by the City pursuant to this order must reflect at a minimum the proportion of women and minorities in the applicant pool, insofar as such hiring is possible given the composition of lists E–27 and E–27A. *Guardians Ass'n of New York City v. Civil Service Comm'n,* 630 F.2d at 113.

ACCORDINGLY,

A. *Permanent Injunctive Relief*

1. Defendants are permanently enjoined from engaging in any act or practice that has the purpose or effect of unlawfully

---

15. *See* January 22, 1987 Declaration of Emmet Condon, Chief of the SFFD, at 4.

16. The court allows this interim hiring procedure only because Chief Condon states that the public safety may soon be jeopardized without it. Absent such compelling circumstances, it would be far preferable to await the development of new examinations. Accordingly, since Chief Condon makes no mention of a critical need for H4 and H20 appointments within the Department, the court does not provide for interim H4 and H20 promotions. These must await the development of new and valid selection procedures, unless the City determines at a later date that the public safety in fact requires interim H4 and H20 appointments. In that case, the City may submit a proposed plan to the court for consideration.

discriminating against any employee of, or any applicant for employment with, the San Francisco Fire Department because of such individual's race, sex, or national origin, and specifically from unlawfully discriminating at any time on the basis of race, sex, or national origin in hiring, promotion, upgrading, training, assignment, discharge, compensation, and terms and conditions or privileges of employment. Defendants shall take reasonable steps to assure that no member of the San Francisco Fire Department retaliates against any person because that person has opposed discriminatory policies or practices or because of that person's participation in or cooperation with the initiation, investigation or litigation of any charge of unlawful discrimination based on race, sex, or national origin, or the administration of this order.

2. The defendants shall not use any selection procedure that has an adverse impact on blacks, Hispanics, Asians, or women in hiring or promotion unless the procedure can be shown to be valid or otherwise justified by business necessity, all in accordance with Title VII and the provisions of the *Uniform Guidelines on Employee Selection Procedures*, 28 C.F.R. 50.14, or successor guidelines.

3. Defendants shall maintain a program of recruitment and training directed at increasing the number of qualified black, Hispanic, Asian, and female applicants for firefighter positions. This recruitment program shall include, but need not be limited to:

(a) the use of media;

(b) developing and maintaining contacts with black, Hispanic, Asian, and women's community organizations to inform their respective memberships of employment opportunities;

(c) active use of black, Hispanic, Asian, and female (upon hiring) uniformed personnel in recruitment activities;

(d) training programs and such other efforts as are necessary and appropriate to advise blacks, Hispanics, Asians, and women of employment opportunities as firefighters; and

(e) training programs that will assist blacks, Hispanics, Asians, and women to obtain the necessary skills to qualify for firefighter positions.

4. The selection procedures which were used in connection with the establishment of List E–27 and List E–27A had a significant adverse impact on blacks, Hispanics, Asians, and women, and have not been demonstrated by the City to be job-related. Accordingly, no appointments shall be made from List E–27 or List E–27A, and said Lists shall expire for all purposes other than their limited use for interim hiring, as outlined below, upon the entry of this order and approval by the court.

5. Defendants shall make no appointments to the position of H2 firefighter until this order has been fully complied with or leave of court is obtained pursuant to the terms set forth in paragraphs 15 through 20 below.

6. Defendants shall not adopt any eligibility list nor make any appointments on an acting, provisional or permanent basis to the ranks of fire inspector (H4) or fire lieutenant (H20) which are based in any way on the selection procedures developed and administered pursuant to the 1984 job announcement for those ranks.

7. Pursuant to agreement of the parties, as set forth in the Joint Pretrial Statement filed August 15, 1986, resolution of any claims regarding relief for the 1978 lieutenant (H20) examination shall await final resolution of the state litigation entitled *City and County of San Francisco v. Fair Employment and Hous. Comm'n.*

8. Defendants shall develop selection procedures for the entry and promotional classifications within the SFFD which are consistent with Title VII and the *Uniform Guidelines*, and shall establish new entry-level firefighter and promotional eligibility lists based upon those procedures.

9. The City shall develop new selection procedures for the ranks of firefighter (H2), fire inspector (H4), and fire lieutenant (H20) which shall be job-related and comport with Title VII and the *Uniform Guidelines*. The City shall complete devel-

opment and administration of the H2, H4, and H20 examinations as soon as possible, with development of the examinations by December 31, 1987, and with administration of the examinations no later than March 31, 1988. Within thirty (30) days after the entry of this order the City shall prepare and file with the court, with copies to counsel for all parties, a timetable setting forth a schedule for completing, as expeditiously as practicable, each phase of the preparation of the new selection procedures and for meetings between the City, the court and counsel for all parties to this action. Such meetings shall provide all counsel with the opportunity to provide input into the City's process for deciding among alternative approaches or formats that may be under consideration.

10. After the filing of the proposed schedule with the court, the court, after consultation with all parties, will establish a final schedule for test development by the City which will provide for:

(a) an initial report to the court and all parties prior to administration of the selection procedures, which shall describe the proposed selection plan, all components of all examinations to be given, and the procedures to be used for administration of the plan and its components. The report shall include a complete statement of the methods and procedures used to develop and validate all test components, including copies of all testing and validation data; and

(b) a report to the court and to all parties subsequent to the administration of each examination component, and upon the conclusion of the entire examination process, which shall describe the administration of and the proposed use of the examination, and which shall include an analysis of the relative performance of candidates by race, sex, and national origin, and the validity of the selection procedures. The reports required under this subparagraph shall be filed within fifteen (15) days of completion of each component.

11. Within thirty (30) days of submission of the City's initial report to the court, any party to this action may present to the court its objections and proposed modifica-tions, if any, to any part of the selection procedures. If objection is made, the parties shall meet and attempt to agree on modifications to those procedures. If the parties are unable to reach agreement within thirty (30) days or such other time as may be agreed upon by the parties, the parties shall submit their respective positions to the court, and the court shall determine the modifications, if any, necessary to bring the selection procedures into compliance with the law.

12. Commencing within ninety (90) days of the date that this order is entered and semi-annually thereafter, the defendants shall file with the court, the United States, and counsel for plaintiff-intervenors a report disclosing the following information:

(a) current firefighter eligibility lists, showing the race, sex, and national origin of the candidates;

(b) summary information showing by race, sex, and national origin, the numbers of applicants who applied for, took, and passed each component of the selection process administered during that reporting period;

(c) a listing of all uniformed Fire Department employees arranged by job title, race, sex, and national origin;

(d) a listing of all appointments (both initial and promotional) in uniformed positions made during the reporting period arranged by job title, race, sex, and national origin;

(e) a listing by name, race, sex, national origin, and job title of all persons terminated from a uniformed position with the Fire Department, noting the reason for that person's termination; and

(f) a listing by name, race, sex, national origin, and job title of all persons who voluntarily resigned from a uniformed position with the Fire Department, noting, if known, the reason for that person's resignation.

Each semi-annual report shall be accurate as of the first day of July and January of each year and shall be filed with the court, the United States and counsel for plaintiff-intervenors no later than August 1

and February 1 respectively. In addition, defendants shall furnish written reports to the United States and counsel for plaintiff-intervenors on matters pertaining to compliance with the order, upon written request.

13. During the time period that this order is in effect, the defendants shall retain all records relating to the recruitment, selection, appointment, promotion, training, evaluation, assignment, and discipline of persons for uniformed positions in the Fire Department, including:

(a) all applications, including applications for hire, transfer or promotion identified by race, sex, and national origin;

(b) examinations, evaluations or records of any nature showing the performance of firefighters on the job or at the training academy;

(c) all written communications between the defendants and applicants for employment, transfer, and promotion;

(d) all records relating to the implementation of the recruitment obligations of this order including a list of all organizations and/or schools that were contacted for recruitment purposes, showing the date and nature of the contact; and

(e) all records relating to the adverse impact and/or validity of selection procedures utilized to fill entry-level or above entry-level firefighter vacancies.

The United States and counsel for plaintiff-intervenors shall have the right to inspect and/or copy for their use in connection with enforcement of this order any or all of the records described above, upon reasonable notice to the defendants. The United States and counsel for plaintiff-intervenors may request inspection or copying of other records for good cause shown upon application to the court.

14. This order shall continue in full force and effect for a period of five years. At any time after such five-year period, defendants may, upon forty-five (45) days notice to the United States and plaintiff-intervenors, file an order of dismissal with the court, which shall be entered unless the United States or plaintiff-intervenors, upon motion served and filed before the proposed date of entry of the order of dismissal, and after a hearing by the court, shows good cause for continuation of this order in whole or in part. During the effective period of this order, the court shall have continuing jurisdiction for the purpose of effectuating its purposes and terms, and providing for its enforcement.

B. *Provisional Interim Hiring*

Pending the development of a new entry-level examination, the following provisional appointment of H2 firefighters may be made if the defendants determine that such hiring is necessary to avert a firefighting crisis:

15. Fifty-four (54) persons, or as many persons as may fill two classes at the Fire College, may be offered positions in the SFFD Fire College to train for positions as provisional H2 firefighters. These persons shall be selected from eligibility lists E–27 and E–27A. The defendants must minimally assure that those offered positions reflect the minority and female proportions of the applicant pool, unless lists E–27 and E–27A include insufficient minorities and women to do so. Any additional interim hiring beyond the 54 positions here authorized must be requested by application to the court.

16. All individuals appointed to the rank of H2 firefighter pursuant to this interim procedure shall serve provisionally until the administration of a new H2 employment testing procedure. At that time, all provisional H2 firefighters must obtain a passing score on all components of the new employment procedure to gain permanent firefighter employment status. All provisional H2 firefighters shall be assured the opportunity to take each component of the new employment testing procedure, and shall be assured permanent employment if they obtain passing scores.

17. If the defendants choose to hire H2 firefighters on an interim basis, the court will appoint a monitor, at the expense of the defendants and paid at a reasonable rate as set by the court, who will be responsible for apprising the court on a

monthly basis of the defendants' compliance with the terms of this order as it pertains to interim hiring, including any and all allegations of discrimination against the new recruits on the basis of race, sex, or national origin. The court will more specifically set forth the selection process and duties of the monitor upon notification by the defendants of their intention to commence interim hiring. Such notification shall be made to the court and counsel for all parties without delay and shall be at least thirty (30) days in advance of any hiring efforts.

(a) As soon as practicable after notification to the court, the defendants shall meet with plaintiff-intervenors and attempt to agree on the name of an individual to be appointed monitor. If they cannot agree on one name, they shall attempt to agree on a list of three names. If they cannot so agree, defendants and plaintiff-intervenors shall submit separate lists each containing the names of three individuals proposed for the position of monitor. The name or names of the proposed individuals and their respective qualifications shall be submitted to the court by defendants and plaintiff-intervenors either jointly or separately no later than fifteen (15) days after the defendants notify the court and counsel that they intend to conduct interim H2 hiring.

(b) No appointments to positions in the Fire College may be made until the monitor has been appointed by the court.

(c) The monitor shall receive weekly reports from the defendants on the status of all recruits in training. Before any member of the classes appointed pursuant to this order shall be terminated from the Fire College, the monitor shall be informed of the reasons for the proposed termination. The termination shall not take effect until the monitor approves the decision.

18. Along with defendants' notification to the court of their intention to commence interim hiring, the defendants shall submit to the court and counsel for all parties a proposed plan including at least the following:

(a) the conduct of background and medical investigations, and the determination of whether potential recruits on lists E–27 and E–27A remain currently qualified for appointment to the Fire College;

(b) the selection and training of Fire College instructors;

(c) the subject matter and structure of the provisional firefighter training program, including but not limited to training on sexual and racial harassment and the feasibility of implementing a "buddy system" whereby each Fire College recruit is assigned a volunteer buddy from the uniformed ranks of the SFFD;

(d) the provision of appropriate equipment for women recruits; and

(e) the assignment of women firefighters, upon graduation from the Fire College, to SFFD stations.

If any party objects to any aspect of the defendants' plan, such objection shall be filed within fifteen (15) days after receipt of the plan. The court will conduct its hearing thirty (30) days after receipt of the plan. No hiring or hiring efforts shall occur until the court has approved the plan.

19. If, after diligent recruitment efforts by the defendants and plaintiff-intervenors, insufficient applicants from lists E–27 and E–27A accept positions as provisional firefighters to fill two classes of the Fire College, the court, upon application by defendants, will reconsider the requirement that all H2 firefighter hiring during the interim period be conducted on a provisional basis.

20. Any plan for interim hiring shall be submitted and, if approved, effectuated substantially in advance of the completion and administration of the validated tests provided for above. Interim hiring will not be permitted on the eve of permanent hiring.

IT IS SO ORDERED.